## E. P. Marriage License

LEFEVER and SHOYER, JJ., May 23, 1957.—It appears from the statements of E. P., the male applicant in the pending application for marriage license, that he is an epileptic.[1] Mr. MacDonnell, assistant orphans'

[1] This is the sixth in a series of opinions in cases involving marriage licenses, written by judges of this court: F. A. Marriage License, 4 D. & C. 2d 1 (prior mental illness) ; Pest and Kolesnik Marriage License, 4 D. & C. 2d 12 (spouses presumed decedents) ; In re Enderle Marriage License, 1 D. & C. 2d 114 (first cousins by adoption) ; Jacobsen Marriage License, 8 D. & C. 2d 144 (first cousins once removed) ; and H. and W. Application for Marriage License, 5 D. & C. 2d 791 (applicants previously married in ceremony of doubtful validity).

court clerk, pursuant to section 9 of The Marriage Law of August 22, 1953, P. L. 1344, 48 PS §§1-1, et seq., refused to issue the license and certified the matter to this court. Thereafter, a full hearing and a supplemental hearing were held.

Section 5 of The Marriage Law of 1953, inter alia, provides:

"No license shall be issued by any clerk of the orphans' court . . .

"(e) If either of the applicants is an *epileptic*, or is or has been, within five years preceding the time of the application, *an inmate of an institution for epileptics*, weakminded, insane, or persons of unsound mind, unless a judge of the orphans' court shall decide that it is for the best interest of such applicant and the general public to issue the license, and shall authorize the clerk of the orphans' court to issue the license." (Italics supplied.)

There are no reported decisions in Pennsylvania with regard to granting to an epileptic a license to marry under The Marriage Law of 1953. This application presents an important problem because there are today between 800,000 and 1,500,000 epileptics in the United States, and a proportionate share of them in Pennsylvania.[2]

---

[2] "The number of epileptics is not accurately known. Physicians believe that the disease is more prevalent than generally appreciated. Doubtless the social attitude and laws affecting epileptics drive unknown thousands 'underground'. On the basis of draft statistics for World Wars I and II, which indicated the incidence of epilepsy to be one-half of one per cent of the population, Dr. William G. Lennox has estimated their minimum number to be 800,000. . . . This may well be a conservative estimate. Lennox has stated that not all draftees would admit having epilepsy, and the incidence of seizures in those below draft age is greater. Allowing for these factors, the incidence of epilepsy may be as much as one per cent of the population. Statement by Dr. William G. Lennox, in files of the Committee. A figure frequently used is 1,500,000. See Wilkes,

From ancient times epilepsy has been considered loathsome and wicked. When a person had it, he was described as being "possessed of the devil". One of the best descriptions of this theory of epilepsy appears in the Bible.[3] There are old tales to the effect that it was considered wise to put the head of a person suffering convulsions into the furnace to burn the devil out of his body. Epileptics were kept segregated, were abhorred and even feared.

The visual unpleasantness of an epileptic seizure tends to prompt a superstitious reaction in the observer and a desire to avoid contact with epileptics; it stigmatizes the disease. Consequently, employes sometimes refuse to work beside an epileptic and certain parents object to an epileptic child's attending school with their children. Such has been the prejudice against epilepsy that many states by statute have absolutely prohibited the marriage of an epileptic. Pennsylvania had such a statute. Section 3 of the Act of June 24, 1913, P. L. 1013, provided that: "No license to marry shall be issued where either of the contracting parties is an . . . epileptic. . . ."

Epilepsy may manifest itself as grand mal, or petit mal. In grand mal, the epileptic is subject to convulsive seizures with the customary prostration, unconsciousness, foaming at the mouth, biting of tongue and lips, etc. These seizures may occur as frequently as a half dozen times daily or as infrequently as once a year. Frequent grand mal seizures may cause brain deterioration. There is much less likelihood of con-

*Our Crime Against the Epileptic*, The American Weekly, September 19, 1954, where the number of epileptics is stated to be about 1,500,000": "Medical Discovery as a Legal Catalyst: Modernization of Epilepsy Laws to Reflect Medical Progress", by Dr. Howard D. Fabing and Dean Roscoe L. Barrow, 50 Northwestern University Review, page 43, footnote 8.

[3] Luke 9:37-43; Mark 9:14-29.

vulsive seizures in petit mal, although the patient "may black out but not show outward signs of seizure" and the possibility of brain deterioration is minimal. Petit mal is less apt to be transmissible.

Epilepsy may be either acquired or idiopathic. The acquired type may be brought on by various known factors, namely, brain injury, intracranial tumors, chemical and metabolic disorder, infections of the nervous system such as encephalitis, hypertension and diabetes. Many persons, who have an acquired type of epilepsy, go through life without any overt signs of the malady. "Idiopathic" or "essential" epilepsy encompasses all other cases which may or may not be definable, viz., congenital, inheritable or epilepsy springing from no known cause; it is a "catch all" in a field of medical science which is still in the pioneer stages. The proportion of idiopathic cases decreases as knowledge of the causes of epilepsy places more cases in the acquired category.

"There is no positive answer" as to whether "epilepsy is transmissible".[4] Many physicians are of the present opinion that epilepsy is not *inheritable*, although a predisposition to the disorder may be inherited, as a recessive trait. The tendency to convulsions among descendants of patients who have had attacks is about one in forty. The children of parents having "idiopathic" seizures are about five times as likely to have attacks as children of apparently normal parents. However, the likelihood of occurrence of grand mal in the epileptic's issue is greater, particularly where the epilepsy is idiopathic; but the modern view is that the transmissibility does not follow an exact Mendelian or genetic pattern. Consideration must also be given to the fact that "carriers" outnumber those who have exhibited seizures, by a ratio

---

[4] N. T., page 6.

of ten to one.[5] A marriage of two carriers may produce offspring with a greater tendency to seizures than offspring of a marriage between one person who has had seizures and one who is completely free of the malady. Yet, there is no practicable way for either the applicant for a marriage license or the issuing official to detect this latent condition.

Happily, all forms of epilepsy usually respond to modern medication. The customary treatment is a combination of barbiturates with dilantin, tridione, mesantoin or other recently developed anticonvulsants. Ordinarily where the epileptic responds to one of these drugs, there is likelihood that other of the drugs will be efficacious when a tolerance develops to the first drug. However, there are certain cases of epilepsy which do not respond to these drugs. In such cases, eventual brain deterioration is common, and the prognosis is guarded at best. By use of anticonvulsants, over 50 percent of those subject to seizure gain complete control, while another 30 percent have fewer seizures. Still others respond to surgery. Therefore, the group which does not respond to any treatment is small, and epilepsy remains a disabling disorder in less than 20 percent of cases.[6]

Marriage produces problems. However, many married epileptics are free from care and worry, do hard work and are as well controlled as people who are not married.

It would seem that certain epileptics should not be permitted to marry, viz., those who show mental deterioration, those whom medicine is unable to control, and those whose family history is studded with epi-

---

[5] A "carrier" is one who has the recessive trait of epilepsy, without exhibiting any external symptoms thereof.

[6] "Epilepsy and the Law", by Dr. Howard D. Fabing and Dean Roscoe L. Barrow (1956), pages 1 and 2.

leptics.[7] Others should probably be granted a marriage license, especially where the applicant has "acquired" epilepsy, where the seizures are controlled by medication, and where there is no family history of epilepsy.[8] In between is the great borderline group. Each such case depends upon its own facts as to whether ". . . it is for the best interest of such applicant and the general public to issue the license".

In deciding each case, attention should be given, inter alia, to the following factors:

1. The likelihood of transmissibility of epilepsy to the issue of the applicants.

2. The likelihood of brain deterioration on the part of the epileptic.

3. The effect of marriage on the epileptic.

4. The physical and emotional condition of the other applicant and what is the reasonable likelihood of his ability to adjust to, and live in a married status with, the epileptic.

In the instant case, the epileptic male applicant is 29 years of age. He has suffered an eye condition, known as nystagmus, since birth. This makes it difficult for him to focus his eyes. However, he can distinguish objects, walk without a cane or other aid and even read print either with the aid of a magnifying glass or with the book held very close to his eyes. Nevertheless, his visual disability is sufficiently serious that he is receiving a blind pension of $60 a month.

When E. P. was 12 years of age, he suffered his first convulsive seizure. He had been shoveling snow in the bright sunshine when he suddenly fell to the ground, striking his head. Dr. Michael O. Grassi, the medical expert, was of the opinion that the striking of his head

---

[7] "Convulsive Seizures", by Tracy J. Putnam, M.D. (1943), page 118.

[8] In such a case this court recently issued a marriage license without written opinion.

was the *result* of the seizure and not the *cause*. Therefore, it would seem that E. P.'s epilepsy is idiopathic.

E. P. has suffered epileptic attacks since that time. At first they were quite frequent. However, he presently undergoes only two or three attacks a year. Customarily, he receives a warning at least 15 minutes before a "spell" and can take precautions to forestall an attack or protect against injury to himself or others during a convulsion. His present medication consists of daily doses of barbiturates and tridione. Electroencephalograms of E. P. were recorded, both when he was under his usual medication, and also when he had desisted from the medication for several days. The significant finding was: "The electroencephalogram indicates that the condition is being kept under control by the medication." Dr. Grassi testified that E. P. "can be kept well under control with mesantoin and tridione and dilantin. I am not saying that we can close the door, but because of his response to the medication he should be fairly free from any seizures". He doubted that the epilepsy would be transmitted to E. P.'s issue, but conceded that there was a possibility of such transmissibility. He was of the opinion that there would be no brain deterioration in this case, provided that E. P. remained under a physician's care, regularly took his medication, and occasional psychotherapy. He stated that E. P. may "be employed in whatever field he might try to excel in. I think he could live a very normal life. . . . I don't think there is any likelihood that he would wind up in an institution".

E. P. conducted himself with poise, frankness and calm dignity on the witness stand. He appears to be a well adjusted and well educated man, a student in a Catholic theological seminary for several years, and, more recently, a student at LaSalle College, where he is presently a member of the junior class. It appears

to the hearing judges that E. P. has met his afflictions with fortitude, understanding and equanimity, and that he will be able to adjust to the problems of matrimony without undue stress or untoward emotional upset which would superinduce more frequent epileptic attacks. Dr. Grassi was of the definite and unequivocal opinion that it is in the best interests not only of the applicant, but of the general public to issue the license.

The female applicant is 26 years of age, attractive and personable. She seemed more emotional and less self-contained than E. P. However, after listening to the lengthy and detailed testimony of Dr. Grassi as to the concomitants of epilepsy, including possible transmissibility of the disease to her children and the chance that E. P. might suffer some brain deterioration, she forthrightly and unconditionally reaffirmed her desire to marry E. P.

Since the family is the basic unit of society, limitation of the epileptic's right to marry may constitute a formidable obstacle to his adjustment. Fear that legal sanctions may be invoked against marriage increases the epileptic's tension. The resulting maladjustment may add a substantial obstacle to the successful treatment of the epileptic. Moreover, laws prohibiting marriage may sacrifice strong moral and ethical values in the society which imposes such sanctions.[9] Furthermore, there appears to be no relationship between mental ability and epilepsy.[10]

---

[9] "Epilepsy and the Law", op. cit., supra, footnote 6, page 602.

[10] "One might as well claim a relationship between genius and epilepsy as between mental defect and epilepsy. Among the great men of history who are reputed to have been epileptic are Buddha, Socrates, Alexander the Great, Julius Caesar, Mohammed, Peter the Great, and Napoleon Bonaparte. The fact is that there is no relationship between epilepsy and either idiocy or genius. An epileptic may possess other infirmities or he may be richly endowed. If an epileptic also happens to be mentally defective, the eugenic

This court, in F. A. Marriage License, 4 D. & C. 2d 1, granted a license where the female applicant had been treated for schizophrenia. We concluded in that case: "This is a borderline case and we confess that we are beset with doubts. However, life at its very best is uncertain. Probably in a strictly disciplined society persons of defective mentality would be deprived of the blessings of matrimony. This, however, is an imperfect world. It is difficult to foretell the unhappy consequences which might result from our refusing to issue a marriage license in this case. . . ."

This, too, is a borderline case, not free from doubt. However, the hearing judges entertain less doubt here than in the cited case. Life indeed is uncertain. It is probably far better that we cannot foresee the future. However, in this case, it appears that the dangers flowing from E. P.'s epilepsy are not overawing, that there is no history of epilepsy in his family, that he is responding magnificently to medical treatment, that the four factors mentioned supra in this case favor the marriage and that "it is for the best interests of such applicant and the general public to issue the license".[11]

---

law would be applied because of the mental defect even if the eugenic law were rendered inapplicable to epileptics. In the ordinary case, the good qualities far outweigh the person's epilepsy. It should be remembered, moreover, that the application of eugenic laws to those epileptics who are richly endowed may prevent persons of the highest intelligence and who are possessed of unusual gifts from marrying and transmitting their potentialities to succeeding generations": "Epilepsy and the Law", op. cit., supra, footnote 6, page 602.

[11] The hearing judges, for the historical and medical data contained in this opinion, have relied upon the following authorities: (a) the testimony in this case of Michael O. Grassi, M.D., psychiatrist; (b) the testimony in the acquired epilepsy case, referred to on page 5 of this opinion by Winslow J. Borkowski, M.D., specialist in Neurology and Epileptology; (c) "Convulsive Seizures", by Tracy J. Putnam, M.D., op. cit., supra, footnote 7; (d) "The Legal

Accordingly, we enter the following

*Decree*

And now, to wit, May 23, 1957, the clerk is directed forthwith to issue a marriage license to the applicants.

Problems of Epilepsy", by Jean P. Mitchell, 29 Temple Law Quarterly 364; (e) "Medical Discovery as a Legal Catalyst; Modernization of Epilepsy Laws to Reflect Medical Progress", by Dr. Howard D. Fabing, and Dean Roscoe L. Barrow, op. cit., supra, footnote 2; and (f) "Epilepsy and the Law", by Dr. Howard D. Fabing and Dean Roscoe L. Barrow, which has been approved by a host of leading experts in the field of epilepsy and neurology in the United States.